UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

**UNSEALED**
3-29-07

United States District Court
Southern District of Texas
FILED GJ 2

MAR 27 2007

Michael N. Milby, Clerk of Court

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| | § Criminal No. M-07-231 |
| v. | § |
| | § [Violations: |
| JOSE ISMAEL SALAS (1), | § 18 U.S.C. § 1962(d): Conspiracy to violate |
| also known as Smiley | § 18 U.S.C. § 1962(c); |
| FIDEL VALLE (2), | § 18 U.S.C. § 2: Aiding and Abetting; |
| also known as Hito | § 21 U.S.C. § 846, 841(a)(1) & 841 (b)(1)(a): |
| ROMEO ROSALES (3), | § Conspiracy to possess with intent to |
| also known as Ro, Roy | § distribute cocaine and marijuana; |
| ADAN ROBERTO RUIZ (4), | § 21 U.S.C. § 841(a)(1) & 841 (b)(1)(a): |
| also known as UCLA | § Possession with intent to distribute |
| JOSE ARMANDO GARCIA, JR. (5), | § cocaine; |
| also known as Mando, Mandio | § 18 U.S.C. § 1201: Kidnaping.] |
| NOEL DE LOS SANTOS (6), | § |
| also known as Boy | § |
| JUAN PABLO HINOJOSA (7) | § |
| also known as Gordo | § |
| BENJAMIN PIEDRA (8), | § |
| also known as Piedra | § |
| JORGE PUGA (9), | § |
| also known as Puga | § |

## SEALED INDICTMENT

THE GRAND JURY CHARGES THAT:

### COUNT ONE
### Title 18 U.S.C. §1962(d)

A.  **The Racketeering Enterprise**

At various times material to this indictment:

1.  Defendants, **JOSE ISMAEL SALAS**, also known as Smiley, **FIDEL VALLE**, also known as Hito, **JOSE ARMANDO GARCIA, JR.**, also known as Mando, Mandio, **NOEL DE LOS SANTOS**, also known as Boy, **JUAN PABLO HINOJOSA** also known as Gordo,

**BENJAMIN PIEDRA, also known as Piedra, JORGE PUGA, also known as Puga,** and others, were members and associates of a criminal organization known as the Texas Syndicate (TS), whose members and associates engaged in murders, attempted murders, conspiracies to commit murder, kidnapping, drug trafficking, and other crimes within the Southern District of Texas and elsewhere.

2. The Texas Syndicate including its leadership, members, and associates, constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact. The enterprise was engaged in, and its activities affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of obtaining the objectives of the enterprise.

3. The Texas Syndicate originated during the 1970's as a response by native Texas inmates to other prison gangs. The Texas Syndicate is a dominant prison gang in the State of Texas and is also recognized nationally as a major prison gang. Texas Syndicate members frequently refer to each other as "carnal" (brother) and maintain a distinct identity by establishing and enforcing specific TS rules, holding meetings, utilizing TS gang signs (horns), and by maintaining a close relationship with fellow gang members and their associates throughout the state. Some, but not all, TS members have TS tattoos. These tattoos commonly include horns ("cuernos"), words containing the letters "T" and "S," or various objects in the shape of a "T" and an "S." Members consider it to be an offense against the organization to have a TS tattoo or to assert that you are a member of the Texas Syndicate prior to becoming a full member. Although obtaining TS related tattoos was once a common practice, some members of the TS have begun avoiding obtaining tattoos in order to shield their association with the TS from law

enforcement. This allows members to function with less oversight, especially within the prison system.

4. A Texas Syndicate recruit is called a "prospecto" (prospect) or "pro." The "prospecto" or "pro" is sponsored by a "carnal" who becomes the "prospecto's" godfather or "padrino." Individuals who perform work for the Texas Syndicate, but are not members, are referred to as associates.

5. The enterprise has a hierarchy for making decisions. Ranking TS members include titles such as lieutenants, sergeants, and sillons (chairmans), while regular members are referred to as soldiers. Each city and jail facility has a sillon (chair). The leadership within the prison system is often run out of the Darrington Unit of the Texas Department of Criminal Justice, commonly referred to by TS members as "Dragon." Transfers of inmates, however, might affect the location of the leadership. These leaders would determine the enforcement of the rules and practices of the Texas Syndicate including when the rules needed to evolve to encompass the changing demands encountered by the organization.

6. Members of the Texas Syndicate are bound by a set of strict rules which ensure loyalty and participation in the enterprise's criminal activities. The rules require that a member must continue his participation in the organization even after his release from prison. Soon after his release from prison, a TS member must contact the high ranking member in the geographical area that the released member intends to reside. No member is permitted to break away from the group. Membership is for life. Any violation of the rules may result in harsh penalties, including death. A member who violates the rules and loses favor becomes a "muleta," which is used to mean a problem. Such a violation may result in the TS bringing their own formal charges against the member who is being accused of violating the rules. Another member may receive a

"camello" (a job) to eliminate this problem. The strict rules and harsh discipline governing the Texas Syndicate help insure that this organization's members and associates will function as a continuing unit despite any changes in membership.

7. The rules of the Texas Syndicate prohibit the distribution of information regarding fellow members to law enforcement. Texas Syndicate members, therefore, generally attempt to conceal their association with this organization from law enforcement. If several TS members commit a crime, it is not uncommon for one member to demonstrate his loyalty by taking responsibility for the crime in order to shield his other TS brothers from the attention of law enforcement. TS members will also assist a fellow member in his pending criminal case. A TS member will attempt to discover the evidence that will be used against the fellow member or discover the names of the witness that will provide testimony in trial.

8. Although the rules of the TS exclude "shady" or "devious" characters, members who commit murders, aggravated assaults, robberies, or traffic in illegal drugs are not classified as being of bad character. Instead, this category is interpreted more narrowly to exclude child molesters and those who fail to follow the rules of the TS.

9. The TS rules provide that the TS is to come before family. "Carnales" make sure that the rules are known. It is understood that members and prospects of the TS may receive a telephone call and instructions to commit a homicide or some other crime for the Texas Syndicate at any time. Regardless of the member's friendship or association with the victim, the orders are to be carried out since the rules mandate that the TS comes first, even before family. The soldiers and prospectos are often used to carry out any violent TS business. Sometimes, members who have a problem or "muleta" that they need to work off in order to achieve a better status with the TS, are called upon to perform the "hits." The TS will not hesitate to kill anyone

who interferes with the business of the gang or who commits a violation of Texas Syndicate rules.

10. Members of the Texas Syndicate maintain regular communication with their members who have been imprisoned on drug distribution and other charges. Such communication is often through letters and telephone calls. Coded language is frequently utilized in order to mislead law enforcement as to the true message contained in the letters or telephone calls. This coded language is often hidden in an otherwise meaningless letter or telephone calls. Examples of coded language indicating that someone is to be eliminated include putting an "X" over the name of the individual or by referring to this targeted individual as "X." Additionally, TS members will state that this targeted individual has a green light, or has been designated as a problem (muleta). A member who has fallen out of favor might also be referred to in the feminine form. Rival gang members may also be referred to in the feminine form and if a "hit" is ordered, the TS will refer to this "hit" or order as having a "green light."

11. Coded language is commonly utilized during drug related phone calls. Cocaine might be referred to by many names including: "white chicks," "huercas," "darlings," "hoes," "twinkies" or "Tia." Suppliers and customers would also use abbreviated numbers to indicate quantity and price, such as an order for two "350 big block engines" that cost $1,250, meaning an order of two kilos of cocaine at $12,500 each. When cocaine was available, the supplier might tell his customers that he had "work" available. The quality of cocaine was frequently discussed in terms of how pretty or how good the girls are. Payments for drugs were often called "receipts."

12. The power of the Texas Syndicate organization is utilized to create fear and intimidation that shields members, ensures the timely payment of drug debts, and prevents the

theft of members' drugs or money. Violent retribution is an important activity of the enterprise. Such retribution helps enforce loyalty to the organization which is necessary to ensure the smooth running of the drug distribution business as well as the violent activities of the enterprise. Members and prospects are made aware that their affiliation with the TS requires their assistance with the criminal activity of the enterprise when called upon to do so and is an important step toward obtaining status in the organization.

13. Although the Texas Syndicate is a national organization with central governing rules, members within this organization have developed geographical groups to better serve the criminal aims of the organization. Each of these geographical groups has some autonomy in deciding how they will achieve their criminal aims, as long as they do not stray too far from the governing rules of the organization.

**B.     The Purposes of the Criminal Enterprise**

14. The principal purpose of the enterprise was to maintain a powerful organization that could protect members and provide financial opportunities through criminal activity which included drug trafficking and/or other criminal acts constituting a pattern of racketeering activity as set forth in this indictment.

15. Members acted to protect each other and to build a strong organization through intimidation and violent retribution against outsiders and through strict and harsh discipline of members and associates who violated the rules and goals of the organization.

**C.     The Manner and Means of the Criminal Enterprise**

Among the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the enterprise were the following:

16. Members and associates of the Texas Syndicate committed crimes, including but

not limited to murder and drug trafficking, to achieve the enterprise's economic goal of making money as well as to enforce the rules of the organization.

17. Victims of the violent crimes were often those who transgressed Texas Syndicate rules regardless of whether this violation was done knowingly or unknowingly. Strict discipline was an important factor in maintaining the strength of this criminal enterprise since it discouraged members from revealing Texas Syndicate business to law enforcement, from working for rival drug enterprises, or otherwise endangering the criminal aims of the organization.

18. Members and associates of the Texas Syndicate conspired with each other to distribute drugs and used the advantages provided by their organization to further their drug business throughout the State of Texas. All members were responsible for carrying out the criminal aims of the enterprise. Telephones were utilized extensively by members to convey Texas Syndicate information. Members would utilize drug contacts who were not members of the Texas Syndicate if this would provide the best financial benefits to the enterprise.

19. Members and associates of the Texas Syndicate used a supplier to obtain controlled substances. **FIDEL VALLE, also known as Hito**, supplied the controlled substances to **JOSE ISMAEL SALAS, also known as Smiley**, other Texas Syndicate members, or their associates for distribution to other places through out the Rio Grande Valley and the State of Texas.

20. Members of the Texas Syndicate had meetings (sometimes referred to as"barbeques") where members would discuss and vote on important decisions. "Prospectos" were generally not allowed to make decisions or be present inside meetings (they stood outside), however, "prospectos" stood ready to carry out decisions made at these meetings as this would

help improve their status in the organization. TS meetings would include discussions regarding what form of retaliation should be utilized to discipline a member or associate who had lost favor with the organization as well as how to make more money, such as through robbing other drug dealers. The available attendees and leaders at these meetings changed over time as members went in and out of prison or were on the run from the law, leaders fell out of favor, or members were killed for violating the rules.

D.     **The Defendants**

21.    The members, prospects, and others associated with the Texas Syndicate held the following roles within the criminal enterprise:

(1) **JOSE ISMAEL SALAS, also known as Smiley** was the most influential member of the Rio Grande Valley chapter of the Texas Syndicate (TS) enterprise.

(2) **FIDEL VALLE, also known as Hito,** was the major drug supplier for the TS in the Rio Grande Valley.

(3) **JOSE ARMANDO GARCIA, JR., also known as Mando, Mandio,**, was a soldier in the TS.

(4) **NOEL DE LOS SANTOS, also known as Boy**, was a soldier in the TS, and was called upon to use violence against others in order to enforce TS rules.

(5) **JUAN PABLO HINOJOSA also known as Gordo** was a soldier in the TS, and was called upon to use violence against others in order to enforce TS rules.

(6) **BENJAMIN PIEDRA, also known as Piedra**, was a soldier in the TS.

(7) **JORGE PUGA, also known as Puga**, was a soldier in the TS.

E.     **The Violation**

22.    Beginning in the mid-1990's, the exact date being unknown to the Grand Jury, and continuing thereafter up to the date of the Indictment, in the Southern District of Texas and elsewhere, the Defendants,

**JOSE ISMAEL SALAS, also known as Smiley**
**FIDEL VALLE, also known as Hito**
**JOSE ARMANDO GARCIA, JR., also known as Mando, Mandio**
**NOEL DE LOS SANTOS, also known as Boy**
**JUAN PABLO HINOJOSA also known as Gordo**
**BENJAMIN PIEDRA, also known as Piedra**
**and**
**JORGE PUGA, also known as Puga**

together with others known and unknown to the Grand Jury, being persons employed by and associated with the enterprise described in Paragraphs 1 through 21 of this Indictment, that is, the Texas Syndicate, which enterprise engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully, knowingly and intentionally, did combine, conspire, confederate, and agree together and with each other and with others known and unknown to the Grand Jury to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5). The pattern of racketeering activity through which the defendants agreed to conduct the affairs of the enterprise consisted of the acts set forth in Racketeering Acts 1 through 8 of Paragraph F of Count One of this Indictment, which are incorporated as if fully set forth herein.

23.   It was part of the conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

F.   **The Racketeering Acts**

24.   The pattern of racketeering activity as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisted of the following acts:

**(1) Racketeering Act One  (Murder of Hector Camacho)**

25.   On or about December 26, 2001, in the County of Hidalgo, and State of Texas,

located within the Southern District of Texas, defendants **JOSE ISMAEL SALAS, also known as Smiley** and **JORGE PUGA, also known as Puga**, aiding each other, did commit an act involving murder, that is, did then and there intentionally and knowingly cause the death of an individual, namely, Hector Camacho, by shooting Hector Camacho with a firearm, a deadly weapon, in violation of Texas Penal Code, Sections 19.02 and 7.01.

### (2) Racketeering Act Two  (Murder of Crisantos Moran)

26.     On or about March 20, 2003, in the County of Hidalgo, and State of Texas, located within the Southern District of Texas, defendants **JOSE ARMANDO GARCIA, JR., also known as Mando, Mandio**, and **NOEL DE LOS SANTOS, also known as Boy** aiding each other, did commit an act involving murder, that is, did then and there intentionally and knowingly cause the death of an individual, namely, Crisantos Moran, by shooting Crisantos Moran with a firearm, a deadly weapon, in violation of Texas Penal Code, Sections 19.02 and 7.01.

### (3) Racketeering Act Three     (Conspiracy to Possess With Intent To Distribute more than 5 kilograms of cocaine and more than 1000 kilograms of Marijuana)

27.     From on or about January 1999, to the present, in the Southern District of Texas, Defendants

**JOSE ISMAEL SALAS, also known as Smiley**
**FIDEL VALLE, also known as Hito**
**JORGE PUGA, also known as Puga**
**JOSE ARMANDO GARCIA, JR., also known as Mando, Mandio**
**NOEL DE LOS SANTOS, also known as Boy**
**JUAN PABLO HINOJOSA also known as Gordo**
and
**BENJAMIN PIEDRA, also known as Piedra**

did knowingly and intentionally conspire together and with other persons known and unknown to

knowingly and intentionally possess with intent to distribute a controlled substance. The controlled substance involved was more than 5 kilograms of cocaine, a Schedule II controlled substance, and more than 1,000 kilograms of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(A).

### (4) Racketeering Act Four (Possession With Intent To Distribute 39 kilograms of Marijuana)

28. On or about March 28, 2003, in the Southern District of Texas, Defendants

**JOSE ISMAEL SALAS, also known as Smiley**
**and**
**JORGE PUGA, also known as Puga**

did knowingly and intentionally possess with intent to distribute less than 50 kilograms of marijuana, that is, approximately 39 kilograms of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D) and Title 18, United States Code, Section 2.

### (5) Racketeering Act Five (Murder of Miguel Elizondo)

29. On or about May 19, 2003, in the County of Hidalgo, and State of Texas, located within the Southern District of Texas, **JUAN PABLO HINOJOSA also known as Gordo and BENJAMIN PIEDRA, also known as Piedra**, aiding each other, did commit an act involving murder, that is, did then and there intentionally and knowingly cause the death of an individual, namely, Miguel Elizondo, by shooting Miguel Elizondo with a firearm, a deadly weapon, in violation of Texas Penal Code, Sections 19.02 and 7.01.

### (6) Racketeering Act Six (Attempted Murder of Mariza Elizondo)

30. On or about May 19, 2003, in the County of Hidalgo, and State of Texas, located within the Southern District of Texas, **JUAN PABLO HINOJOSA also known as Gordo and**

**BENJAMIN PIEDRA, also known as Piedra**, did then and there intentionally and knowingly with the specific intent to commit the offense of murder, did then and there attempt to cause the death of an individual, Mariza Elizondo, by attempting to shoot the victim, with a firearm, said act amounting to more than mere preparation that tended but failed to effect the commission of the offense intended, in violation of Texas Penal Code, Sections 15.01, 19.02 and 7.01.

### (7) Racketeering Act Seven   (Possession With Intent To Distribute 6 kilograms of Cocaine)

31.    On or about August 12, 2004, in the Southern District of Texas, and within the jurisdiction of the Court, Defendants

**JOSE ISMAEL SALAS, also known as Smiley  
and  
FIDEL VALLE, also known as Hito**

aided and abetted by other persons known and unknown to the Grand Jurors, did knowingly and intentionally possess with intent to distribute a controlled substance. The controlled substance involved was more than 5 kilograms of cocaine, that is, approximately 6 kilograms of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A) and Title 18, United States Code, Section 2, as charged in Count Three of this Indictment.

### G.    The Overt Acts

32.    In furtherance of the conspiracy and in order to effect the objects thereof, the Defendants and their co-conspirators, known and unknown to the Grand Jury, committed and caused to be committed the following overt acts, among others, in the Southern District of Texas and elsewhere:

(1) On or about December 26, 2001, **JOSE ISMAEL SALAS, also known as Smiley,**

in Hidalgo County, Texas did shoot at Hector Camacho with a firearm.

(2) On or about December 26, 2001, **JORGE PUGA, also known as Puga,** in Hidalgo County, Texas, did shoot Hector Camacho with a firearm.

(3) On or about March 20, 2003, **JOSE ARMANDO GARCIA, JR., also known as Mando, Mandio**, in Hidalgo County, Texas did shoot Crisantos Moran with a firearm.

(4) On or about March 20, 2003, **NOEL DE LOS SANTOS, also known as Boy,** in Hidalgo County, Texas, did shoot Crisantos Moran with a firearm.

(5) On or about March 28, 2003, **JOSE ISMAEL SALAS, also known as Smiley**, and **JORGE PUGA, also known as Puga,** in Hidalgo County, Texas, did possess and package marijuana at a residence located in Alamo, Texas.

(6) On or about May 19, 2003, **JUAN PABLO HINOJOSA, also known as Gordo,** gave a firearm to **BENJAMIN PIEDRA, also known as Piedra,** and informed him that they were going to visit Miguel "Mike" Elizondo at his San Juan, Texas residence.

(7) On or about May 19, 2003, **JUAN PABLO HINOJOSA, also known as Gordo,** told **BENJAMIN PIEDRA, also known as Piedra**, to ask Mariza Elizondo, to use the restroom so that **JUAN PABLO HINOJOSA, also known as Gordo**, could then shoot and kill Miguel "Mike" Elizondo.

(8) On or about May 19, 2003, **JUAN PABLO HINOJOSA also known as Gordo** told **BENJAMIN PIEDRA, also known as Piedra** that once he heard gun shots, that **BENJAMIN PIEDRA, also known as Piedra** was to shoot and kill Marissa Elizondo.

(9) On or about May 19, 2003, **BENJAMIN PIEDRA, also known as Piedra**, in Hidalgo County, Texas did go to a residence in San Juan, Texas for the purpose of murdering Miguel Elizondo.

(10) On or about May 19, 2003, **BENJAMIN PIEDRA, also known as Piedra**, in Hidalgo County, Texas, did use a firearm to shoot at Miguel Elizondo.

(11) On or about May 19, 2003, **BENJAMIN PIEDRA, also known as Piedra**, in Hidalgo County, Texas, did use a firearm to shoot at Mariza Elizondo.

(12) On or about February 12, 2004, **JOSE ISMAEL SALAS, also known as Smiley**, in Hidalgo County, Texas, did agree to sell approximately ¼ kilogram of cocaine to a prospective buyer.

(13) On or about March 22, 2004, **JOSE ARMANDO GARCIA, JR., also known as Mandio, Mando,** did contact **JOSE ISMAEL SALAS, also known as Smiley**, in Hidalgo County, Texas, and requested that **JOSE ISMAEL SALAS, also known as Smiley,** provide money to bond out **ADAN ROBERTO RUIZ, also known as UCLA,** from the Hidalgo, Texas county jail for the specific purpose of having **ADAN ROBERTO RUIZ, also known as UCLA,** smuggle illegal drugs into the Hidalgo County jail.

(14) On or about May 8, 2004, **ADAN ROBERTO RUIZ, also known as UCLA,** did bond out of the Hidalgo County jail.

(15) On or about May 13, 2004, **ADAN ROBERTO RUIZ, also known as UCLA,** was arrested for disorderly conduct outside the Hidalgo County jail.

(16) On or about July 24, 2004, **JOSE ISMAEL SALAS, also known as Smiley,** in Hidalgo County, Texas, did contact **ROMEO ROSALES, also known as Ro, Roy,** and others known and unknown for the purpose of performing a home invasion.

(17) On or about July 24, 2004, **JOSE ISMAEL SALAS, also known as Smiley,** in Hidalgo County, Texas, did instruct **ROMEO ROSALES, also known as Ro, Roy,** and others known and unknown to go into the house that had been targeted for the home invasion.

(18) On or about July 24, 2004, **ROMEO ROSALES, also known as Ro, Roy,** and others known and unknown, in Hidalgo County, Texas, did attempt to locate the home that was targeted for the home invasion.

(19) On or about July 30, 2004, **JOSE ISMAEL SALAS, also known as Smiley**, in Hidalgo County, Texas did contact **ROMEO ROSALES, also known as Ro, Roy,** and **ROBERTO RUIZ, also known as UCLA,** and instructed them to obtain items to be used to package illegal drugs.

(20) On or about July 30, 2004, **JOSE ISMAEL SALAS, also known as Smiley**, in Hidalgo County, Texas, did instruct **ADAN ROBERTO RUIZ, also known as UCLA,** on how to package the illegal drugs.

(21) On or about July 30, 2004, **JOSE ISMAEL SALAS, also known as Smiley**, in Hidalgo County, Texas did take illegal drugs into the Hidalgo County, Texas jail.

(22) On or about August 12, 2004, **JOSE ISMAEL SALAS, also known as Smiley**, in Hidalgo County, Texas did contact **FIDEL VALLE, also known as Hito,** to obtain information on the purchase of cocaine.

(23) On or about August 12, 2004, **FIDEL VALLE, also known as Hito,** in Hidalgo County, Texas did provide cocaine to Vicente Duarte Casas and Noe Martinez-Lopez.

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT TWO

[21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)]

From on or about March 28, 2003, to the present, in the Southern District of Texas, and within the jurisdiction of the Court, Defendants

**JOSE ISMAEL SALAS, also known as Smiley**

**FIDEL VALLE, also known as Hito**
**ROMEO ROSALES, also known as Ro, Roy**
**and**
**ADAN ROBERTO RUIZ, also known as UCLA**

did knowingly and intentionally conspire with other persons known and unknown to the Grand Jurors to knowingly and intentionally possess with intent to distribute a controlled substance. The controlled substance involved was more than 5 kilograms of cocaine, a Schedule II controlled substance, and more than 1,000 kilograms of marijuana, a Schedule I controlled substance.

In violation of Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(A).

## COUNT THREE
### [21 U.S.C. § 841(a)(1), and 841(b)(1)(A)]

On or about August 12, 2004, in the Southern District of Texas, and within the jurisdiction of the Court, Defendants

**JOSE ISMAEL SALAS, also known as Smiley**
**and**
**FIDEL VALLE, also known as Hito**

aided and abetted by other persons known and unknown to the Grand Jurors, did knowingly and intentionally possess with intent to distribute a controlled substance. The controlled substance involved was more than 5 kilograms of cocaine, that is, approximately 6 kilograms of cocaine, a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A) and Title 18, United States Code, Section 2.

## COUNT FOUR
### [18 U.S.C. §1201]

On or about August 24, 2004, in the Southern District of Texas, and within the

jurisdiction of the Court, Defendant

**ROMEO ROSALES, also known as Ro, Roy**

did knowingly and acting contrary to law, did kidnap, seize, confine, and inveigle Amancio Pinales-Garcia for some purpose or benefit and did wilfully transport Amancio Pinales-Garcia while so kidnaped, confined and inveigled in foreign commerce.

In violation of Title 18, United States Code, Sections 1201 and 2.

A TRUE BILL

FOREPERSON

DONALD J. DeGABRIELLE, JR.
UNITED STATES ATTORNEY


_Robert Wells K_
ASSISTANT UNITED STATES ATTORNEY